IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| George von Brugger, individually and on behalf of other similarly situated individuals, | Civil No. 0:13-cv-00005-JNE-FLN |
| Plaintiff, | |
| v. | **Plaintiff's Memorandum of Law In Opposition to Motion To Transfer Venue** |
| Jani King of Minnesota, Inc., Jani-King Inc., and Jani-King International, Inc., | |
| Defendants. | |

## INTRODUCTION

This case has 4 parties. The Plaintiff, an employee that Jani- King illegally underpaid and 3 interrelated entities that operated as his employer. All three entities are Minnesota residents under Venue law. They also all directed and often micro-managed Plaintiff's work and the Minnesota operations of Jani-King on a daily, hourly and often minute by minute basis.

Plaintiff has offered specific evidence in support of his assertion that the interest of justice would be harmed by a transfer of his case to recover wages to North Texas. First, he is unemployed and could not serve as class-representative even a Plaintiff in Texas. The inconvenience to him would cause the claim to cease. Second, the relevant witness for venue consideration [those that are not under the control of a party] *all reside* in Minnesota. Third, the events in question, issues of when plaintiff worked and who was his employer when he performed those tasks, all occurred in Minnesota or involve

Minnesota residents. Fourth, the location of documents favors Plaintiff since Defendants' documents were stored electronically and Plaintiff has identified boxes of documents that he maintained during his employment that are located in Minnesota.  Fourth and most importantly, the law strongly favors the Plaintiff's choice of venue.

Defendants have only offered a self-serving, highly conclusory declaration from their former legal counsel to support their assertions.  In contrast, Plaintiff has offered many pages of company records that show Defendants' allegations concerning company operations to be, at best, misleading and inaccurate.  According to the records in evidence the parent companies micro-manages the Minnesota office of Jani-King.  Plaintiff has provided documentary evidence that even the sole corporate Declarant was copied in on an e-mail tracking the minute by minute location of Plaintiff's car.  Defendants clearly acted as one enterprise.

Defendants have not met their heavy burden of proof as a movant seeking transfer. Instead of even addressing the current litigation [one Plaintiff and three Defendants that operate as one entity] Defendants have concocted an assertion that the venue should be transferred based on potential sham Defendants that are not currently and never will be part of this litigation.  That assertion is improper since *venue defenses are personal* to the party that is allegedly inconvenienced.  Ignoring, that that requirement, Defendants attempt to meet their heavy burden based primarily on arguments concerning those sham defendants.[1]

---

[1] They make a secondary argument concerning future opt-in Plaintiff's.  That argument, is also personal to the party.
Conditional certification [which Defendants strongly oppose] has not been granted.  In addition, that argument is

## STATEMENT OF FACTS

**A.  Plaintiff worked for all three defendants, since the businesses were combined.**

Plaintiff worked for Jani-King for more than 16 years. (von Brugger declaration at ¶ 2) In Plaintiff's personal observation and experience, the three entities, Jani-King of Minnesota, Inc., Jani- King, Inc., and Jani-King International Inc., all worked closely together to sell and service cleaning franchises. (Id.)  The Minnesota office [Jani-King of Minnesota] was a regional office closely taking instruction from the Jani-King Inc. and Jani-King International Inc. on all major decisions and many of the day to day activities. (von Brugger declaration at ¶3)

He frequently observed that his work and the work of his co-workers was monitored daily, hourly and minute by minute by various employees of Jani-King International, Inc. (Id. at ¶4) As a result, they instructed him on almost all details, of how they wanted him to perform his work. (Id.)

### Defendants Shared Operations
*Minnesota Customer Service Operations performed by Parent Companies*

At the onset of Plaintiff's employment, the customer service position for Jani-King of Minnesota, Inc. was performed in Minnesota, but that operation was moved to the Texas parent companies about 6 years ago.  (von Brugger declaration at ¶5) Therefore, Minnesota companies, that made or received customer service calls in support of the Jani-King business, were *only* called from Texas, and that essential function of the business was conducted by Jani-King, International, Inc. (Id.) As a result, customers from

---

routinely denied since any putative Plaintiffs won't opt in if they are inconvenienced.  Also there is no prejudice to putative Plaintiffs if they don't opt in.

Minnesota who would call Jani-King's toll free customer service line, would have their call answered in the "call center" in Texas. (Id. at ¶6)   An employee from Jani-King International Inc., would answer their call, and operate as their customer service representative, addressing the Minnesota issue.   (Id.)   The customer service person would then follow-up with the Minnesota office and the operations director to make sure that the problem had been addressed properly. (Id.)   During this time period, the Jani-King International customer service department would also contact all of our customers each month.  (Id.)

EXHIBIT EIGHT [redacted to remove Client names and billing totals] is a copy of a Jani-King of Minnesota. Inc. Customer Service Call Log for the period of April 1, 2012 through May 25, 2012.   Plaintiff used this log in my employment and kept this copy. (von Brugger declaration at ¶33)   It identifies which person in customer service had called the customer, and the names of each customer contacted. (EXHIBIT EIGHT)  That company record also includes Ms. Teague's many, many contacts with the customers in Minnesota, on each of the 31 pages by company name and date, and the details of her conversations with the clients. (Id. at ¶33)  The person identified as 'steague' is Stephanie Teague, Customer Service Representative, Jani-King International, Inc. (von Brugger declaration at ¶33)

### *Minnesota telemarketing was all performed by the parent companies*

At about that same time [6 years ago], the telemarketing department, which set sales appointments in Minnesota was transferred from the Minnesota regional offices to Jani-King International Inc. von Brugger declaration at ¶ 7)  Therefore, telemarketing to

4

potential customers located in Minnesota was performed by Jani-King International Inc. (Id.)

### The parent companies micro-managed Plaintiff's work

Likewise Plaintiff often took instruction, coaching and counseling from Corporate Operations Advisors during his employment. (von Brugger declaration at ¶8) Those individuals were employed by Jani-King International, Inc., and they performed job duties such as: franchise operational relations and training; assisting in the supervising and training of regional operations and office team; handling customer relations issues regarding franchise owners and clients, to maintain an acceptable customer retention rate; performing hands-on inspections of accounts in the regions; audit regional operation procedures and processes; starting-up and maintaining customer accounts; gathering data and producing reports on production and operations; and sales and bid support for the regions as needed, including presentations. (Id.)  After their visits to the Minnesota office, the Corporate Operations Advisors would generate a report, which was copied to the Regional Director.  This report assessed each employee and department in the Minnesota office.  (von Brugger declaration at ¶9)

Likewise, similar to the Corporate Operations Advisors, there were Corporate Sales Advisors from the parent companies. (Id. at ¶10)   They frequently visited Minnesota to advise the sales staff and the Regional Director.  (Id.)  The payroll function of Jani-King of Minnesota Inc. was mainly handled by Jani-King International Inc.  (Id. at ¶11)   The time records were sent to them, and they would complete the payroll processing, issuing of paychecks, and expense reimbursements.  (Id.)  They also closely

controlled the amount Plaintiff was paid, and decided whether or not he would be paid a commission on revenue he generated for the company through sales and bid corrections. (Id. at ¶12)

### The business of the three companies were heavily interrelated

As a result, Plaintiff observed that the operations of the companies were heavily interrelated. (von Brugger declaration at ¶13)  They were so interrelated that Plaintiff was listed as an employee of Jani-King International Inc., (Id.) He also observed that he was treated as an employee of all three companies named as Defendants in this lawsuit as he had to report to the Corporate Offices, Jani-King International Inc., as well as the Minnesota Offices. (Id. at ¶14)

### The parent companies frequently listed Plaintiff as an employee

Jani-King International Inc., listed Plaintiff as an employee. (von Brugger declaration at ¶15) For example, attached hereto as EXHIBIT ONE is a true and correct copy of his Group Life Insurance Certificate during his employment. (Id.)  In that certificate his employer is listed as **EMPLOYER: JANI-KING INTERNATIONAL, INC.**  (bold in original), [at page 1].  According to EXHIBIT ONE, definitions at page 4 and 5 states that Plaintiff had to be actively working for the Employer at the Employer's usual place of business to be covered by that insurance and the Employer is listed as Jani-King International, Inc., at page 5 [referencing page 1] (von Brugger declaration at ¶15)

Similarly the employee health plan Plaintiff was offered was Jani-King International Inc.'s, Employee Life and Health Benefit Plan. (EXHIBIT ONE, page 4 of

6

the selected pages).   Plaintiff is not aware of Jani-King of Minnesota, Inc. offering any

such benefits.  (von Brugger declaration at ¶16)

Plaintiff also has attached selected pages from, what he was told by his employer,

was his company's handbook. (Id. at ¶17)   It is the JANI-KING INTERNATIONAL,

INC. EMPLOYEE HANDBOOK. (Id.) Attached hereto as EXHIBIT TWO, is a copy of

that handbook. (Id.) Plaintiff's Jani-King employee handbook is signed by the Jerry

Crawford, the President of Jani-King International, Inc. (Id.)   It welcomes the new

employees to Jani-King International Inc. [and no other company]  (Id.)

The Jani-King Employee Handbook outlined many of the employment guidelines

with the company. [Jani-King International Inc.] (von Brugger declaration at ¶18) It also

sets forth the wage and hour and other policies for Jani-King International, Inc. (Id.)

Plaintiff's handbook  EXHIBIT TWO, at page 33, lists the details of Jani-King

International Inc.'s sexual harassment policy. (von Brugger declaration at ¶19) The final

pages of my Jani King handbook, EXHIBIT TWO, required that Plaintiff acknowledge

understanding that Jani-King International, Inc.'s Employee Handbook represents

guidelines. (Id. at ¶20) Plaintiff was also required to acknowledge that no person or

representative of the Company, other than **the President of Jani-King International,**

**Inc.,** had any authority "guaranteeing you employment for any specific period of time."

(EXHIBIT TWO at p 61)(von Brugger declaration at ¶20)

Plaintiff also was subject to the drug and alcohol policy of Jani-King International,

Inc. (EXHIBIT TWO at p. 62) and to acknowledge the receipt of his employer Jani-King-

International, Inc.'s, anti-harassment policy. (von Brugger declaration at ¶21) The second

to the last page of my Jani-King handbook states the policy for that any wage deduction would be taken by his *employer* Jani-King International, Inc. (EXHIBIT TWO p. 63) (von Brugger declaration at ¶21)

Plaintiff's Jani-King short term disability insurance was also offered by his employer and it lists Jani-King International, Inc., as his employer. (Id. at ¶22) Attached hereto as EXHIBIT THREE is the short term disability packet he received from his employer Jani-King. (Id.) His employment relationship with Jani-King International, Inc. is clearly stated in that document. (Id. at ¶ 23) In fact, at one point he collected those benefits. (Id.)

Plaintiff also signed a Jani-King model release for his employer Jani-King International, Inc., (Plaintiff's Declaration EXHIBIT FOUR).

Likewise, Plaintiff was given the option of enrolling in his employer's 401 k plan. His employer's plan was "Jani-King International, Inc.'s benefit plan" including its 401 k plan. (von Brugger declaration EXHIBIT FIVE) Throughout the benefit plan that Plaintiff was given by his employer, the employer is identified as Jani-King International, Inc., (von Brugger declaration at ¶24)

### *The parent companies micro-managed the regional offices*

In his many years with the company Plaintiff observed that the Regional offices were treated as satellite offices of Jani-King International and Jani-King, Inc. (Id. at ¶25) The parent companies exercised direct authority over the local office on a daily, hourly and sometimes even minute by minute basis. (Id.) Their control extended down to

minute details including tracking where his employer-provided car traveled on a minute by minute basis. (Id.)

### *Plaintiff's daily work was micro-managed by the parent companies*

von Brugger EXHIBIT SIX is a common example of the parent company's micro-management of Plaintiff's work.  Pages 3 and 4 of that document are e-mail records that reference the tracking program that was required to be on Plaintiff's company car. (Plaintiff's Declaration EXHIBIT SIX at 3-4) In that email trail, Mike Cavanaugh [Director with Jani-King International, Inc.,] discussed reviewing the time Plaintiff spent in his car as well as the location of his car. (von Brugger declaration at ¶26)  The report Mr. Cavanaugh generated is entitled a Stop Start Report for Jani-King Corporate. (Id.) Having corporate [Jani-King International Inc.,] monitor his car and then criticize the length of time he spent at any one spot was not unusual when he worked for Jani-King. (Id.) Instead, it was typical of the close control they exercised over his work and the lack of independence for his position. (Id.) Mr. Cavanaugh reported Plaintiff's stops that day to both George Selman (Regional Director, Minnesota) and to Mr. Burleson [the person who prepared the declaration on behalf of Jani-King in this matter].   (Plaintiff's Declaration ¶28 *and* EXHIBIT SIX, at page 2)

One of the Corporate Operations Advisors from Jani-King International, Inc., even went so far as to demonstrate to himself and his direct supervisor Tom Schellinger the video capabilities of the tracking system.  (von Brugger declaration at ¶ 27)  He showed Plaintiff and his Supervisor, on his laptop, how he could use a car camera to see the view from an Operations Manager or Assistant Operation Manager's car. (Id.)   He turned on

the program and then pulled up the screen for the view from the car in front of them to demonstrate how he could track the employees. (Id.)

Plaintiff's *activities in the company automobile* were monitored by Jani-King, International, Inc., (von Brugger declaration at ¶29) That included his whereabouts on a minute by minute basis. (Id.)   Executives from Jani-King International Inc. would then often criticize the length of time he had taken at a particular inspection, if they felt he had taken too much or too little time. (Id.)   They also would criticize other aspects of his work schedule when they monitored his vehicle use. (Id.)

For example, on March 22, 2011 Stephanie Teague, Customer Service Representative, Jani-King International, Inc. sent an e-mail concerning one of Plaintiff's accounts. (von Brugger declaration at ¶32 and EXHIBIT SEVEN)   In it she tells his boss Tom Schellinger about a complaint she received from the customer in Minnesota about whether: "the cleaners are putting the bar stools and chairs back down after they are done cleaning the floors." (Id.)   Ms. Teague requested follow up from Mr. Schellinger on this issue. (Id.)   That interaction was typical since it was also Ms. Teague's job to contact all of the customers in the Minnesota region on a monthly or bi-monthly basis. (von Brugger declaration at ¶32)

Another example of the micromanagement of Plaintiff's work by Jani-King International, Inc., is reflected in EXHIBIT NINE which is another email trail. (von Brugger declaration at ¶34 and EXHIBIT NINE) This trail records communications between Jeff Livingston, Hospitality Advisor from Jani-King International Inc., and plaintiff. (Id.)   Mr. Livingston was not only directing Plaintiff's work, but he then

reminded Plaintiff on May 29, 2012 that: "We [International] need to review [a sales proposal for a job] it before proceeding." [2] (Id)

Yet another example of the close control is another set of e-mails that were directed to the Minnesota Office from Jill Bean a Vice President of Jani-King International, Inc. and Chadd Clements from Jani-King Inc.  (von Brugger declaration at ¶35, EXHBIT TEN)  In those e-mails they made the decision to waive the finder's fees for the franchise owner, thereby disallowing any commissions to be paid to myself for this contract. (von Brugger declaration at ¶35)  That interaction was a typical example of how Plaintiff had to rely on Jani-King International Inc.'s discretion over whether he would be paid commission for any sales efforts.  (Id.)

Similarly, the Corporate Operations Advisors were very active in Plaintiff's activities and he also reported closely to them. (von Brugger declaration at ¶36) EXHIBIT ELEVEN is an e-mail from Mike Kase, Corporate Operations Advisor, Jani-King, Inc. on January 25, 2011. (Id. and EXHIBIT ELEVEN) In that e-mail Mr. Kase states that "We have been directed to call all the Ops Mgrs daily. This is being done by the ED's to the RD's.  I will try and call each of you at around 8:30 your time so we can talk about your morning brief, your asst's daily plan and pending cancellations." (Id.) That was typical of the very close control they maintained over operations daily.  . (von Brugger declaration at ¶36)

---

- [2] The corporate review is in reference to a proposal submitted to the Minnesota client.

In Plaintiff's experience Jani-King, Inc. and Jani-King International. Inc. had the same level of control over all of his compensation. (von Brugger declaration at ¶38)  Jani-King International, Inc., made the decision to eliminate Plaintiff's position and terminate his employment. (Id.)  At that time, Robyn Carlson Director of Human Resources, Jani-King International, Inc., through Tracy Pfeiffer, RSM, presented him with a written document offering a severance package from Jani-King International, Inc. (Id.)

### Upper levels of the local office were also controlled by the parent companies.

Likewise, in his experience, the Minnesota upper levels of management, like the Operations Managers and Assistant Operations Managers, were subject to very close direction from Jani-King Inc., and Jani-King International, Inc. (von Brugger declaration at ¶30) Any major decisions or even marginally significant decisions they faced were almost always brought to the attention of the parent companies for sign off. (Id.)

Once a week, the operations department in Minnesota was required to attend a staff meeting phone conference, with the Corporate Operations Advisor from Jani-King International, Inc. and the customer service representative that was servicing their accounts. (von Brugger declaration at ¶31)  During those phone conferences they were instructed by the Corporate Operations Advisors.  (Id.)  For instance, they would direct them on how to address any problems arising that week. (Id.)  They also demanded and received detailed reports from [the Minnesota Operations department] on nearly all of their activities. (Id.)   In short, that meeting was yet another way that Plaintiff observed the parent companies directly micro-managing his work. (Id.)

12

***There was daily micro-management of Minnesota operations by the parent companies.***

Likewise the direct involvement of Jani-King International, Inc. occurred on a daily basis. (von Brugger declaration at ¶37)  As an example attached is a July 25, 2011, e-mail from Earnest V. Martinez, Corporate Director of **Operations, Jani-King International, Inc.,** herein he directs all Executive Directors of Corporate Development, Regional Directors and Operations Managers concerning evening inspections. (Id. and EXHIBIT TWELVE) In the e-mail he directed each region to make it a policy that each Operations Assistant change their work schedule to work at least one evening per week and set appointments with an average of three accounts per week with one prospective franchise owner in a designated territory. (Id.)  He also provides specific details for what he wanted from each visit. (Id.) He went on to state: "**I would like a list compiled each week and sent to me regarding which accounts have been visited and the details of the visit." (Id.) [Emphasis added].**  He also provided the form for his subordinates in which to fill out the weekly reports. (Id.)

Even the hiring in Minnesota was not done without the approval of Jani-King International, Inc., (von Brugger declaration at ¶39) The company established a formula for how many employees could work at each location each month, based on the sales of that location. (Id.) The other human resources functions of Jani-King were also handled by Jani-King International, Inc., (Id.)

***The Minnesota office operated only as a regional office of the parent companies.***

In Plaintiff's 16 plus years of employment at Jani-King he doesn't recall ever hearing the Regional Offices being referred to as "affiliates" or "satellite offices". (von

Brugger declaration at ¶44) They were called "Corporate" Regional Offices as opposed to the Master Franchises which also had offices outside of Dallas. (Id.)  He is not familiar with the term "affiliates", but his lawsuit does not include the master franchises. (Id.)

**In the interest of justice, Minnesota is the best location:**

Plaintiff could not afford to bring a case in Texas, after opposing Jani-King's illegal payroll policies and being terminated by Jani-King. (von Brugger declaration at ¶41) If this case were moved to Texas, he could not afford to travel there at this time, to recover his unpaid wages. (Id.)  He has not been employed since Jani-King terminated him. (Id.at ¶42)

**In the interest of justice the listed non-party controlled witnesses are in Minnesota:**

Nearly all of the [not party controlled] relevant witnesses are in Minnesota. A few of those witnesses include:

- George Selman, former Regional Director, who could testify to my daily activities and compensation [no longer employed by Jani-King];

- Helen Nelson, Office Manager, Minnesota;

- Tracy Pfeffer, current Regional Sales Manager, Minnesota;

- Tom Schellinger, Director of Operations, Minnesota;

- Steve Schmidt, Operations Manager, Minnesota;

- Bob Lindquist, Former Operations Manager, Minnesota;

- Troy Nobel, Former Operations Manager, Minnesota;

- Jacob Bebe, Former Assistant Operations Manager, Minnesota;

- Kaylyn Allie, Administrative Assistant, Minnesota;

- Kim Garvey former Administrative Assistant, Minnesota;

- Brianna Madison, Administrative Assistant, Minnesota;

- Vonita Cieslewski, Accounting Assistant, Minnesota;

- Carrie Hutchins,  former Administrative Assistant, Minnesota;

- MANY Client witnesses, Franchise Owners, who could testify not only as to my duties but also as to the contacts form Ms. Teague and Jani-King International, Inc.;

- And more,

(von Brugger declaration at ¶43)

**Relevant documents are available in Minnesota:**

Plaintiff maintained detailed records from his employment and those records are maintained here in Minnesota. (von Brugger declaration at ¶45)   In addition, the directives to the Local Office were sent here as well. (Id.)  Finally, in his experience, all of the relevant Jani-King files were kept on a company server that is accessible locally. (Id.)

## I.      ARGUMENT

## A.  PLAINTIFF'S CHOICE OF FORUM

### *Considerable deference is given to the Plaintiff's choice of forum*

Traditionally, there is a strong presumption in favor of Plaintiff's choice of forum. in evaluating a motion for transfer of venue. In *Piper Aircraft Co. v. Reyno*, 454 U.S.

235, 255 (1981), the United States Supreme Court noted that "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." *Id., See also Coady v. Ashcraft & Gerel.*, 223 F.3d 1 at 11( 1st Cir., 2000) ("The burden of proof rests with the party seeking transfer; there is a strong presumption in favor of the plaintiff's choice of forum").

Similarly, the Eighth Circuit has recognized that "considerable deference" is given "to a plaintiff's choice of forum," and, therefore, the "party seeking a transfer under section 1404(a) typically bears the burden of proving that a transfer is warranted." *In re Apple, Inc.*, 602 F.3d 909, 913 (8th Cir. 2010) Thus a transfer will not ordinarily be ordered simply to make it more convenient for the defendant: "The venue transfer provisions of Section 1404(a) are not meant merely to shift the inconvenience to the plaintiff." *Reed Elsevier, Inc. v. Innovator Corp.,* 105 F.Supp. 2d 816, 821 (S.D. Ohio 2000) [internal quoted omitted].

Any substantial conflict in the affidavits is ordinarily resolved in plaintiff's favor in order to uphold Plaintiff's choice of forum whenever possible. See, *Noerr Motor Freight, Inc. v. Eastern R.R. Presidents Conference*, 113 F.Supp. 737, 745 (ED PA 1953)

### *Size of the parties weighs in favor of Plaintiff*

Also, when the plaintiff is an individual and the defendant is a large corporation, defendant's assertions regarding monetary expense and difficulty in litigating in a distant forum are likely to be disregarded. *Miracle v. NYP Holdings*, 87 F.Supp.2d 1060, 1073

(D HI 2000)  *See, Dwyer v. General Motors Corporation,* 853 F.Supp. 690, 693 (SD NY 1994)

Defendants, in short, have not made "a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986)  *Conference*, 113 F.Supp. 737, 745 (ED PA 1953)

### *Because of the opt in nature of collective actions Plaintiff's control venue*

Observing that the FLSA provides an "opt-in" procedure under 29 U.S.C. §216(b), courts have concluded that "Congress intended to give plaintiffs consider-able control over the bringing of an FLSA action". *Alix v. Shoney's, Inc.*, No. 96-2812 Section "R"(1), 1997 U.S. Dist. LEXIS 1963 *10 (E.D. La. Feb. 18, 1997); *Salinas v. O'Reilly Automotive, Inc.*, 358 F. Supp. 2d 569, 571 (N.D. Tex. 2005) (stating that in FLSA collective actions, "as opposed to Rule 23 class actions, no person can become a party plaintiff and no person will be bound by or may benefit from judgment unless he has affirmatively "opted into" the class; that is given his written, filed consent""); *Onyeneho v. AllState Ins. Co.*, 466 F. Supp. 2d 1, 5 n.2 (D.D.D. 2006) (stating that "collective actions under the FLSA require prospective plaintiffs to affirmatively opt-in to the action, unlike class actions under Federal Rule of Civil Procedure 23, in which plaintiffs are included unless they opt-out"); *Guerrero v. Habla Communicaciones*, No. H-05-3620, 2005 U.S. Dist. LEXIS 41358 *6-7 (S.D. Tex. Mar. 16, 2006) (observing that "[i]f such a plaintiff decides that it would be too inconvenient to opt-in here, he or she can file suit closer to home. A plaintiff who does choose to opt-in here would presumably be

signaling his judgment that the relative inconvenience was not particularly significant"). Courts have noted that this opt-in structure "suggests that Congress intended to give plaintiffs considerable control over the bringing of a FLSA action." *Onyeneho v. Allstate Ins. Co.,* 466 F.Supp.2d 1, 6 n. 2 (D.D.C.2006).

## B.  IMPROPER VENUE DEFENSES ARE *PERSONAL*

### *Defendants' assertions concerning future possible parties are improper. Those defenses are personal to the party to whom they apply*

The central argument asserted by Defendants' is that other parties that might either join or be named in this case cause the venue to be improper.  They are not proper parties to assert that argument.  "[T]he defense of improper venue is personal to the party to whom it applies.  Thus a resident defendant may not avail himself of a dismissal or transfer as to a non-resident unless the latter is an indispensable party." [*Anrig v. Rigsby United,* 603 F.2d 1319, 1325; *see also, Goldberg v. Wharf Constructors,* 209 F.Supp. 499, 503-504 (ND Al.1962)

### *Nominal or sham parties must be disregarded.*

Furthermore, the residence of "nominal" or "sham" defendants [or plaintiffs]  may be disregarded in determining whether "all defendants" reside in the local district. *Messinger v. United Canso Oil & Gas, Ltd.,* 80 FRD 730, 733-734 (D.Ct. 1978)  For example, when a Plaintiff brought an action in federal court in Texas against a defendant residing in Texas, and as a co-defendant the second defendant was not served and no cause of action was stated against him in the complaint, the second Defendant's residence

could be ignored for the purpose of determining venue.  *Id.*  He was considered a sham defendant

### *In this case the "sham parties" are not even parties to this action.*

In this case the sham parties have not been named and there is no need or intention to include them. Plaintiff did not work for them and they were not the de facto employers of the putative class members  The true employers are the Parent companies who set the offending policies and who micromanaged operations.

### C.    EVEN WHEN MAKING PROPERLY ASSERTED ARGUMENTS, MOVANTS BEAR A HEAVY BURDEN IN TRANSFER MOTIONS

**Movants must demonstrate that the relevant factors weigh *strongly* in their favor**

Generally courts must be cognizant, that transfer motions "should not be freely granted." *In re Nine Mile Ltd.,* 692 F.2d 56, 61 (8th Cir.1982), *abrogated on other grounds by Mo. Hous. Dev. Comm'n v. Brice,* 919 F.2d 1306 (8th Cir.1990). A "heavy" burden rests with the movant to demonstrate why a motion to transfer venue should be granted. *E.g., Integrated Molding Concepts, Inc. v. Stopol Auctions, L.L.C.,* Civ. No. 06-5015, 2007 WL 2263927, at *5 (D.Minn. Aug. 6, 2007) (Schiltz, J., adopting Report & Recommendation of Erickson, M.J.); *Radisson Hotels Int'l, Inc. v. Westin Hotel Co.,* 931 F.Supp. 638, 641 (D.Minn. 1996) (Kyle, J.). To satisfy their "heavy" burden, the movants must demonstrate that the relevant factors weigh "strongly" in their favor. *Id.*

### **Facts supporting the motion are vague generalizations and insufficient**

Plaintiff has provided many pages of documents and admissible company records in support of his response to this motion.  In contrast Defendant has offered a conclusory

declaration.  An affidavit in support of a transfer motion must offer admissible evidence of the facts involved, conclusory declarations are not sufficient. Stop −A- Flat Corp. v. Electra Start of Michigan, Inc., 507 F. Supp. 647, 652  (ED PA 1981)  Therefore the party seeking transfer is not only obligated to identify the key witnesses to be called but also to provide a summary of what their testimony would include.  *Heller Fin'l, Inc. v. Midwhey Power Co., Inc.*, 883 F.2d  1286, 1293 (7th Cir. 1989).

### *Location: the parties are all residents of Minnesota.*

Venue rules are based on the parties "residence" and a corporation is a resident of "any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question."  28 U.S.C. §1391(c)(2).

Corporations are "deemed to reside . . . in **any** jurisdiction in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question."  [28 U.S.C. §1391 (c) (2) (emphasis added). Therefore, in actions against a corporation, venue is no longer a separate requirement.  It is satisfied by proof that the corporate defendant is subject to personal jurisdiction in the district.  *In Re Volkswagon of America, Inc.* 545 F.3d 304, 312-313 (5th Cir. 2008); 28 USC §1391(c)(2).

Plaintiff has shown that the parent corporations were involved in micro-managing the Minnesota operations.  They tracked Plaintiff's every movement when he was in his car conducting client visits and inspection which were primary duties of Plaintiffs'.  They also operated as the customer service department for the Minnesota operations as well as the telemarketing department.  Plaintiff has also offered specific evidence that the local office merely took directions from the parent companies in nearly every respect.

On the other hand there is no showing of Plaintiff's connection to Texas. He would be forced to bring this matter in a forum that would be highly inconvenient to him as a non-resident.

### Location: where the conduct complained of occurred

Plaintiff performed nearly all of his work in Minnesota. The overtime work was also performed in Minnesota. The paychecks for Plaintiff's pay were also delivered in Minnesota.

A determination of Plaintiff's primary duties is the first issue in the case. Those duties were performed in Minnesota and witnessed by Minnesota residents. Likewise the control exercise by the parent companies occurred in Minnesota [weekly meetings and reports that occurred in Minnesota and were drafted in Minnesota].

### Convenience of the parties and the non-controlled witnesses

Convenience of the witnesses is certainly a factor for the Court's consideration. However, Defendants' memorandum and the declaration of Mr. Burleson, providing a list of potential witnesses, name only employees of Defendants. A defendant's motion to transfer under section 1404(a) may be denied when the witnesses are employees of the defendant and their presence can be obtained by the party. *Galonis v. National Broadcasting Co.,* 498 F.Supp. 789 (D.N.H.1980); *Federal Practice and Procedure* § 3849, at 408–10 (2d ed. 1986); *Ashmore v. Northeast Petroleum Div. of Cargill, Inc.* 925 F.Supp. 36, 38-39 (D.Me.,1996).

Although Plaintiff has yet to identify all of the witnesses he may call they are nearly all located in Minnesota and they include former co-workers, franchise owners and

clients.  None of those witnesses are in Plaintiff's control.  Therefore, the non-controlled

witness issue clearly favors Plaintiff.

### Availability of documents also favors Plaintiff

One factor the First Circuit has directed district courts to evaluate is the

availability of documents. *Cianbro Corp. v. Curran-Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir.

1987). This factor seems like a holdover from a time when businesses kept important

records, including payroll records, in paper and the difficulty of physically accessing the

paper documents and the burden of transporting them across jurisdictions could be

onerous. *See* 15 FEDERAL PRACTICE AND PROCEDURE § 3853 (stating that "since

most records and documents now can be transported easily or exist in miniaturized or

electronic form . . . their location is entitled to little weight"). It is doubtful that this factor

has as much salience now as it did decades ago.

Even if it did Plaintiff has identified boxes of documents that he has maintained

that are relevant to this matter.  Defendants' documents are maintained online and

accessible locally.

### While docket congestion may be considered, it is not a dispositive factor in assessing the interest of justice.

Docket congestion is a permissible factor to consider in deciding a § 1404(a)

motion, but it is not "by itself, a dispositive factor." *P & S Bus. Machs., Inc. v. Canon

USA, Inc.,* 331 F.3d 804, 808 (11th Cir.2003). The interests of justice are not served when

a district with a relatively swift docket becomes a "willing repository" for cases that have

no connection to it. *Original Creatine Patent Co. v. Met-Rx USA, Inc.,* 387 F.Supp.2d

564, 572 (E.D.Va.2005), cited with approval in *In re Apple, Inc., 602 F.3d 909, ___,*

*2010-1 Trade Cases P 76,980, _____* (8th Cir. 2010).

## CONCLUSION

Plaintiff's choice of venue in this case is an obvious one.  He lives and works in Minnesota and that is where Defendants and the witnesses also reside.  Minnesota is where he was underpaid and wrongly classified as an exempt employee based on claims about his job duties.

Defendants' primary attack on Plaintiff's venue choice is to assert claims which are not theirs to assert.  Those claims are improperly made on behalf of sham non-parties that are not and will not be part of this case.  Therefore, Plaintiff respectfully requests that this motion be denied.


Dated: March 28, 2013                     **JONES SATRE & WEIMER, PLLC**

                                          s/ Eric D. Satre
                                          Eric D. Satre, MN Bar No. 183015
                                          Attorneys for Plaintiff
                                          7900 Xerxes Avenue South
                                          820 Wells Fargo Plaza
                                          Bloomington, MN 55431
                                          Telephone (952) 820-8400
                                          Facsimile (952) 820-8410
                                          esatre@jonessatre.com